IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| LARSON MOTORS, INC. and RJ 35700, LLC,<br><br>                Appellant,<br><br>          v.<br><br>JET CHEVROLET, INC., DAN JOHNSON, and JIM JOHNSON,<br><br>                Respondent. | No. 83124-1-I<br><br>UNPUBLISHED OPINION |

CHUNG, J. — This matter between Larson Motors (Larson) and Jet Chevrolet (Jet) arises out of the failed sale of an auto dealership. In 2020, Larson contracted with Jet to purchase its business assets and real property. The transaction fell through after General Motors denied Larson's application for a dealer license. Larson sued for breach of contract and breach of the duty of good faith and fair dealing. The trial court granted Jet's motion for summary judgment. On appeal, Larson challenges the grant of summary judgment, the denial of its motion for a continuance under CR 56(f), and the trial court's award of attorney fees to Jet, which was based on contract language providing for attorney fees in arbitration.

We affirm the trial court's summary dismissal of Larson's breach of contract claims and the denial of the CR 56(f) motion, but reverse the award of attorney fees.

FACTS

This dispute arises from a failed business transaction. In October 2020, Rob Larson of Larson Motors entered an agreement with Jim and Dan Johnson, owners of Jet Chevrolet, for the purchase of an existing automobile dealership. The parties executed two contracts—an Asset Purchase Agreement (APA) for the sale of the dealership assets and a Real Estate Purchase and Sale Agreement (REPSA) for the sale of the real property. Broadly, the contracts contained covenants that the parties would: (1) fully cooperate with one another and use their "reasonable best efforts" to satisfy the conditions of the agreement; (2) endeavor to procure all necessary third-party consents; and (3) refrain from discussing the sale or any information regarding a possible sale with any outside party.

A condition of the sale was that "[Larson] shall be approved and appointed by General Motors as a franchised Chevrolet dealer at [Jet's] Dealership location in Federal Way, Washington and a standard Chevrolet Dealer Sales and Service Agreement shall be approved and appointed by General Motors making [Larson] a franchised Chevrolet dealer." The contracts assured that Jet would submit written notice of the transaction to GM and would authorize GM to communicate directly with Larson regarding the transaction. Further, the contracts stated that Jet would provide any necessary documentation requested for Larson to complete its new dealer sales and service application.

The parties contracted to close on the sale "no later than December 20, 2020." However, the APA specifically anticipated having to extend the closing

date in order to wait for GM's approval. Larson would have a right to extend the closing date unless GM informed the parties it would not approve Larson's application:

> [I]n the event Closing cannot occur by on or before December 20, 2020 because Purchaser has not received General Motors' commitment to issue it a standard Dealer Sales and Service Agreement on terms subject to the discretion of Purchaser in Purchaser's sole discretion, the Closing date of December 20, 2020 is extended thirty (30) days unless General Motors has informed Purchaser it will not grant it a sales and service agreement.

Otherwise, the contract provided that either party had the right to terminate the agreement if the sale were not able to close on time.

Jet notified GM of the proposed sale to Larson shortly after the contracts were signed. For various reasons, including Larson's loss of a key employee who was responsible for gathering the necessary documentation, GM did not receive a completed application from Larson until January 27, 2021—more than a month after the original closing date. The parties extended the closing date multiple times while Larson worked through GM's application process. Jet's owners contacted various partners at GM in an attempt to expedite or assist in the review so that the transaction could move forward.

GM notified Jet on March 19, 2021, that it had rejected Larson's dealer application. It provided Larson separate written notification of the decision on March 23. Jet and Larson sent a letter to GM asking it to reconsider its decision, but GM refused. Jet's owner also called personally to ask GM to reconsider.

Larson, however, demanded that Jet appeal GM's decision to the State Department of Licensing and extend the closing date indefinitely, pending the

resolution of the appeal. Larson offered to pay the full purchase price if Jet would agree to close the transaction without GM's authorization. Larson also offered to pay Jet's legal fees for, and indemnify it in, the proposed administrative hearing or any future litigation against GM. Jet rejected these terms. Jet offered to file the administrative appeal only if Larson agreed to pay its attorney fees to date and release future claims against Jet and its owners. In addition, Jet offered to extend the closing several additional weeks, until May 1, 2021. Larson, unsatisfied with these terms, rejected the proposals and terminated the contract.

The APA and REPSA each included an enforcement provision, which described dispute resolution procedures and payment of costs and attorney fees for mediation and arbitration of disputes. However, in lieu of those procedures, Larson filed a complaint in King County Superior Court on April 15, 2021. Jet did not object to Larson's failure to seek mediation or arbitration. Instead, it responded to Larson's complaint and immediately moved for summary judgment dismissal. Larson, in turn, moved for a CR 56(f) continuance to conduct further discovery. Specifically, Larson requested discovery from Jet's real estate broker, whom it believed had withheld copies of his text messages soliciting buyers for Jet. The court heard oral argument on June 18, and granted Larson a three-month continuance.

A second summary judgment hearing took place on September 10, 2021. Larson expressed continued frustration with Jet's insistence on moving for early summary judgment rather than continuing the discovery process; however, Jet's counsel did not request a second continuance.

After hearing oral argument, the trial court granted Jet's motion for summary judgment and awarded Jet attorney fees. Larson appeals.

ANALYSIS

I. Denial of CR 56(f) Continuance

As a preliminary matter, Larson argues that the trial court abused its discretion by not continuing the summary judgment hearing a second time to allow Larson to engage in further discovery. In spite of the initial three-month continuance, Larson argued that summary judgment was still premature, yet it did not request another continuance. Instead, at the summary judgment hearing, the court noted there had already been two rounds of briefing and that she needed "to decide it based on the pleadings that have already been submitted unless there's a compelling reason to grant another continuance," and later reiterated it was her obligation "to decide the case based on the record that's before me at the present time, not things that come in later." Subsequently, the court granted summary judgment, without allowing a continuance or submission of additional evidence.

We review a trial court's decision on a request to continue a summary judgment hearing for abuse of discretion. Bldg. Indus. Ass'n of Washington v. McCarthy, 152 Wn. App. 720, 743, 218 P.3d 196 (2009). A trial court abuses its discretion if it bases its decision on untenable or unreasonable grounds. State ex rel. Carroll v. Junker, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

A trial court may continue a summary judgment hearing if the nonmoving party shows a need for additional time to obtain additional affidavits, take

depositions, or conduct discovery. CR 56(f); Winston v. Dep't of Corr., 130 Wn. App. 61, 64-65, 121 P.3d 1201 (2005). "The trial court may deny a motion for a continuance when (1) the requesting party does not have a good reason for the delay in obtaining the evidence, (2) the requesting party does not indicate what evidence would be established by further discovery, or (3) the new evidence would not raise a genuine issue of fact." Butler v. Joy, 116 Wn. App. 291, 299, 65 P.3d 671 (2003) (citing Tellevik v. 31641 W. Rutherford St., 120 Wn.2d 68, 90, 838 P.2d 111, 845 P.2d 1325 (1992)). Denial is proper if based on any one of these factors. Pelton v. Tri-State Mem'l Hosp., Inc., 66 Wn. App. 350, 356, 831 P.2d 1147 (1992).

At the September 2021 hearing, Larson's counsel noted that the discovery cutoff was not until February 2022, and suggested Jet's broker was "intentionally not providing documents," and Larson did not "have the ability to get complete documents." Yet Larson did not move for a second continuance. When a party has not clearly requested a continuance, the trial court does not err in deciding a summary judgment motion based on the evidence before it. Bldg. Indus. Ass'n of Wash., 152 Wn. App. at 742; see also Turner v. Kohler, 54 Wn. App. 688, 692-94, 775 P.2d 474 (1989) (affirming denial of a continuance where the party's summary judgment affidavits did not explicitly request a continuance, reference CR 56(f), or state the reason for delay); Burmeister v. State Farm Ins. Co., 92 Wn. App. 359, 368 n.6, 966 P.2d 921 (1998) ("an oral request for a continuance does not appear to comply with the requirement in CR 56(f) that such a request be made by affidavit"). Moreover, while CR 56(f) allows a court to order a

continuance "[s]hould it appear from the affidavits of a party opposing the motion that . . . the party cannot present by affidavit facts essential to justify the party's opposition," here, Larson did not submit any affidavits regarding the need for a second continuance.[1]

Larson not only did not provide a reason for its delay in obtaining the discovery sought, it did not explain how additional discovery would lead to new evidence that would raise an issue of material fact. While the record shows that at his deposition, Jet's broker indicated it was "possible" he received text messages regarding the Jet-Larson deal that he had not searched for on his phone, his counsel later confirmed that he had checked and had "none related to Jet Chevrolet." Speculation that there were additional relevant texts was insufficient to support a continuance. There is also no evidence that Larson had sought to depose the people it later claimed in its brief on appeal that it needed to depose (Axel Johnson, Russell Lloyd, or Court Pixton).

Under the circumstances, the trial court did not abuse its discretion in failing to grant a continuance that Larson had not properly requested and for which there was no factual or legal support.

II. Breach of Contract Claims

Larson appeals the trial court's grant of summary judgment dismissing its claims against Jet. We review rulings on summary judgment de novo. Am.

---

[1] In her affidavit in support of Larson's opposition to the motion for summary judgment, Larson's attorney stated only, "Plaintiffs still need to depose Mr. Dinsmore regarding the documents he produced in response to their subpoena." There was no information about any efforts to seek his deposition or explanations for the delay in doing so.

Legion Post No. 149 v. Dep't of Health, 164 Wn.2d 570, 584, 192 P.3d 306 (2008). Summary judgment is appropriate where there is no genuine issue as to any material fact—if from all the evidence, reasonable persons could reach but one conclusion. CR 56(c); Wojcik v. Chrysler Corp., 50 Wn. App. 849, 853, 751 P.2d 854 (1988). If so, then the moving party is entitled to judgment as a matter of law. Meyers v. Ferndale Sch. Dist., 197 Wn.2d 281, 287, 481 P.3d 1084 (2021). The court must view the facts and reasonable inferences in the light most favorable to the nonmoving party. Id.

Larson's complaint stated breach of contract as the sole cause of action. This claim was based on allegations that Jet: (1) breached its contractual duty to cooperate in gaining GM's consent to the sale; (2) violated the implicit duty of good faith and fair dealing; and (3) disregarded the contract's exclusivity provision by negotiating with and/or seeking alternative buyers while still under contract with Larson. We address these arguments in turn.

A. Cooperation to Effectuate the Sale

Larson contends that the cooperation language of the APA obligated Jet to appeal GM's rejection of Larson's dealer application, regardless of how long the appeal process may have taken.[2] "Where the facts are undisputed, such as where the parties agree that the contract language controls and there is no extrinsic evidence to be presented," contract interpretation is a matter of law.

---

[2] By statute, only the current dealer has standing to appeal GM's decision. RCW 46.96.200. In a separate action, the federal court recently dismissed Larson's claim that it was a third-party beneficiary of Jet's dealer contract with GM. See Larson Motors v. General Motors, No. C21-1367 (W.D. Wash. March 30, 2022), 2022 WL 952182.

Mutual of Enumclaw Ins. Co. v. USF Ins. Co., 164 Wn.2d 411 n.9, 191 P.3d 866 (2008). "An interpretation of a writing which gives effect to all of its provisions is favored over one which renders some of the language meaningless or ineffective." GMAC v. Everett Chevrolet, Inc., 179 Wn. App. 126, 140, 317 P.3d 1074 (2014).

Section 5.1 of the APA required each party to use "reasonable best efforts to cause all conditions to this Agreement and the transactions described in this Agreement to be satisfied as promptly as possible and to obtain all consents and approvals necessary for the due and punctual performance of this Agreement." More specifically, Section 5.13 prescribed these actions by Jet:

> Seller will (i) submit to General Motors written notice of the proposed transaction authorizing General Motors to discuss with Purchaser all relevant matters pertinent to completing this transaction as contemplated by this Agreement; and (ii) provide necessary documentation and information requested by Purchaser to facilitate completion of a new dealer sales and service application to General Motors.

It was undisputed that Jet notified GM of its intent to sell the dealership. Further, Jet agreed to extend the closing date multiple times, even though the delay was due to Larson's failure to timely provide the necessary documentation for the dealer application and the extensions required Jet to pay additional financing fees.

Larson's proffered interpretation of the contract—that Jet was required to appeal GM's decision—ignores the plain language of Section 6.1, which lays out the circumstances under which the parties may terminate the agreement. Specifically, Section 6.1(g) states that either party would be entitled to terminate

the agreement "if the Closing shall not have occurred on or before December 20, 2020, or such subsequent date as agreed by the Parties in writing." Recognizing that GM's approval was a necessary condition to the sale, Section 6.1(g) further provides:

> [I]n the event Closing cannot occur by on or before December 20, 2020 because Purchaser has not received General Motors' commitment to issue it a standard Dealer Sales and Service Agreement … the Closing date of December 20, 2020 is extended thirty (30) days <u>unless General Motors has informed Purchaser it will not grant it a sales and service agreement</u>.

(Emphasis added.) Thus, a plain language reading of this termination language anticipates two possibilities: (1) if the parties had not received a commitment from GM by December 20—i.e., they had not yet received a response—the closing date would automatically be extended, but (2) if the parties had received a negative response from GM by December 20, then the closing date would not automatically be extended. In the second situation, if the closing date were not extended, then under Section 6.1(g), either party would be allowed to terminate the APA.

Larson's proposed interpretation of the contract terms would functionally eliminate Jet's right to terminate for lack of GM's approval. To give effect to both Section 5.1's "reasonable best efforts" language and Section 6.1(g)'s language providing a right to terminate if GM denied approval, "reasonable best efforts" cannot be read to require Jet to appeal GM's denial.

### B. Duty of Good Faith and Fair Dealing

Larson next argues that Jet's refusal to pursue the administrative appeal violates the duty of good faith and fair dealing. The parties dispute the scope of

this implied duty. Larson argues that the duty of good faith transcends the specific contract provisions and requires Jet to take all actions necessary to effectuate the contract, while Jet argues that the duty can apply only in relation to specific contract terms.

Every contract includes an implied duty of good faith and fair dealing. Badgett v. Sec. State Bank, 116 Wn.2d 563, 569, 807 P.2d 356 (1991). This implicit duty "obligates the parties to cooperate with each other so that each may obtain the full benefit of performance." Id. Direct interference with or failure to cooperate in the other party's performance may violate the duty of good faith. Edmonson v. Popchoi, 172 Wn.2d 272, 280, 256 P.3d 1223 (2011).

The duty of good faith "requires only that the parties perform in good faith the obligations imposed by their agreement." Badgett, 116 Wn.2d at 569. It neither requires that a party accept material changes to, nor injects substantive terms into, the agreement. Id. "The duty of good faith requires 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.' " Edmonson, 172 Wn.2d at 280 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981)). Further, "[t]he implied duty of good faith is derivative, in that it applies to the performance of specific contract obligations. If there is no contractual duty, there is nothing that must be performed in good faith." Johnson v. Yousoofian, 84 Wn. App. 755, 762, 930 P.2d 921 (1996) (citations omitted).

In addition to arguing generally that the good faith obligation is broad, Larson appears to suggest the relevant contract terms that require this duty are

11

the obligation in Section 9.7 to "perform any [sic] all acts reasonably necessary to carry out the terms" of the APA. But not only is the contract quite specific as to what those obligations are—such as the obligation to provide necessary documentation and information to facilitate completion of a new dealer sales and service application to GM—the contract also already includes a "reasonable best efforts" clause.

To the extent that there is a duty of good faith regarding the performance of the "reasonable best efforts" provision, there is no issue of material fact as to whether Jet satisfied this duty. Washington law requires manufacturer approval for a dealership sale. RCW 46.96.200. Jet provided GM with notice of the sale and agreed to multiple closing extensions to allow Larson to complete the application. Jet's owners repeatedly reached out to their business contacts at GM, first in an effort to move the review process along, and then asking them to reconsider the denial. GM declined to do so, and by the terms of the contract itself, once GM denied approval, either party could terminate the APA. Thus, Jet's failure to agree to petition the Department of Licensing and extend the closing date—in other words, to negotiate new terms—does not constitute evidence of bad faith with regard to the original contract.

Finally, Larson argues that Jet acted in bad faith to torpedo the sale because Jet's owners were unhappy with the original valuation of the property and believed they could get a better price from another buyer. This speculation as to Jet's possible motive to breach ignores the fact that the parties entered into a contract only after Larson increased its initial offer to a mutually agreeable

sales price. Larson cannot rely on such conclusory allegations and speculative statements to defeat summary judgment. Boyd v. Sunflower Props., LLC, 197 Wn. App. 137, 142-43, 389 P.3d 626 (2016). While bad faith interference in one party's ability to perform may breach the implied duty of good faith, Edmonson, 172 Wn.2d at 280, here, Jet did not interfere with Larson's dealer approval process.

C. Breach of Exclusivity Provision

Larson further alleges that Jet breached the APA's and REPSA's exclusivity requirements and solicited alternative buyers while under contract with Larson. At the hearing, Larson relied on the following: (1) a sworn declaration by Larson's deal counsel stating that Larson "had reason to believe" Axel Johnson, the son of one of the owners, was looking for buyers, based on inadmissible hearsay; (2) a statement by another attorney who declined to represent Jet in the sale due to a potential conflict of interest to another client who was interested in purchasing the dealership; (3) an email from Jet to GM intimating that they had another buyer lined up; and (4) a series of communications between Jet's broker and another potential buyer after the Jet-Larson deal fell through, ostensibly discussing a new deal.

As the trial court noted, there was some evidence that Jet had conversations with another potential buyer both before Jet entered into an agreement with Larson and shortly after Larson terminated the contract. However, not only did such conversations not occur while the contract was in effect, but there was no evidence that any such actions were a proximate cause

of the contract termination, or of Larson's alleged damages. A breach of contract is actionable only if the contract imposes a duty, the duty is breached, and the breach proximately causes damage to the claimant. NW Ind. Forest Mfrs. v. Dep't of Labor & Indus., 78 Wn. App. 707, 712, 899 P.2d 6 (1995). Because Larson failed to present any evidence that Jet's alleged breach of exclusivity was the proximate cause of the contract termination and any resulting damages, Jet was entitled to judgment as a matter of law.

III.  Attorney Fees

Larson also challenges the trial court's fee award as unsupported by the terms of the contract. A trial court may grant attorney fees only if the request is based on a statute, a contract, or a recognized ground in equity. Gander v. Yeager, 167 Wn. App. 638, 645, 282 P.3d 1199 (2012). We review the trial court's decision to award fees de novo. Id.

The parties present the issue as whether, by waiving the right to arbitrate, the parties also waived the right to fees. Yet both ignore the plain language of the agreements, which both provide that all disputes should first be submitted to mediation, if reasonably possible, and at that stage, "[e]ach party shall pay its attorney fees and costs for the mediation and one-half of the mediator's fees and costs." The contracts further state that if mediation "reaches such an impasse, said dispute shall be determined by binding arbitration in accordance with the laws of the state of Washington." Regarding costs and fees in arbitration, the APA provided:

> Each party shall pay one-half of the arbitrator's fees and costs, unless one party is ruled the prevailing party by the arbitrator, in

which case the arbitrator, subsequent to the arbitration itself, <u>may</u> award the prevailing party the arbitrator's fees and costs and the prevailing party's attorney fees and costs with the fees and costs to be determined subsequent to the arbitration itself.

(Emphasis added.) The REPSA contained a similar, but not identical, provision:

Each party shall pay one-half (1/2) of the arbitrator's fees and costs, unless one party is ruled the prevailing party by the arbitrator, in which case the arbitrator, subsequent to the arbitration itself, <u>shall</u> award the prevailing party the arbitrator's fees and costs and the prevailing party's attorney fees and costs with the fees and costs to be determined subsequent to the arbitration itself.

(Emphasis added.) The trial court held that the REPSA's language mandated an award of fees to the prevailing party, even though the parties had waived their rights to arbitration.[3]

The contracts anticipate both mediation and arbitration and address attorney fees differently for each. This distinction suggests that the right to attorney fees is specific to the type of enforcement proceeding and, thus, that the right to attorney fees and costs applies solely to arbitration—not to mediation or litigation in a court. To grant Jet attorney fees would be to rewrite the contract to provide a benefit for which the parties did not negotiate. Therefore, the trial court erred by awarding Jet fees.

Jet also requests its fees on appeal. RAP 18.1(a) allows an award "[i]f applicable law grants to a party the right to recover reasonable attorney fees."

---

[3] The contractual right to arbitration may be waived through a party's conduct if not timely invoked. <u>Shepler Const., Inc. v. Leonard</u>, 175 Wn. App. 239, 248, 306 P.3d 988 (2013). Though Jet relies on <u>Shepler</u> to support its argument for fees, the <u>Shepler</u> court did not address the issue of whether an arbitration clause's fee-shifting provision should apply when the parties waived arbitration; rather, the court simply awarded fees without analysis. Thus, <u>Shepler</u> does not provide a basis to disregard the plain language of the contract here.

Because the contract does not provide for attorney fees in litigation at trial or on appeal, there is also no basis for a fee award on appeal.

We affirm the trial court's denial of a CR 56(f) continuance, affirm the summary judgment dismissal, reverse the award of fees below, and deny Jet's request for attorney fees on appeal.

_Chung, J._

_Smith, A.C.J._          _Mann, J._